**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 24-cr-366 (JEB)** |
| **v.** | : | |
| | : | |
| **DARYL GRAHAM,** | : | |
| | : | |
| **Defendant** | : | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. Daryl Graham pled guilty to two second degree misdemeanors, a violation of 40 U.S.C. § 5104(e)(2)(D) (disorderly or disruptive conduct on the grounds or in the buildings of the United States Capitol) (Count One) and a violation of 40 U.S.C. § 5104(e)(2)(G), (parading, demonstrating, or picketing in any Capitol building) (Count Two). For the reasons set forth herein, the government requests that this Court sentence Graham to 14 days' incarceration on Count One and 36 months' probation on Count Two. The government also requests that this Court impose 60 hours of community service, and, consistent with the plea agreement in this case, $500 in restitution.

## I.    Introduction

Daryl Graham, a 59-year-old self-employed handyman, participated in the January 6, 2021, attack on the United States Capitol—a violent attack that forced an interruption of Congress's certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power

after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[1]

Graham pleaded guilty to violations of 40 U.S.C. §5104(e)(2)(D) and 40 U.S.C. §5104(e)(2)(G). The government's recommendation is supported by Graham's decision to join an onslaught of rioters climbing up to the Capitol's Upper West Terrace. Once he arrived on the Upper West Terrace, Graham loitered among the mob as he observed the chaos around him. He entered the Capitol through a fire door adjacent to the Parliamentarian's office carrying a "STOP THE STEAL" sign at 2:58 p.m. Graham did not leave the Capitol voluntarily. Instead, police officers forcefully pushed the mob, which included Graham, out of the Capitol. After officers removed Graham from the Capitol at 3:00 p.m., he did not leave Capitol grounds. Instead, he remained for at least another hour and a half. After his departure he posted a range of images, videos, and comments to Facebook gloating over his conduct.

The Court must also consider that Graham's conduct on January 6, like the conduct of scores of other defendants, took place in the context of a large and violent riot that relied on numbers to overwhelm police, breach the Capitol, and disrupt the proceedings. But for his actions alongside so many others, the riot likely would have failed. Here, the facts and circumstances of

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9 million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

Graham's crime support a sentence of 14 days' incarceration and 36 months' probation in this case.

## II.    Factual and Procedural Background

### *The January 6, 2021, Attack on the Capitol*

To avoid unnecessary exposition, the government refers to the general summary of the attack on the U.S. Capitol. *See* ECF 15 Statement of Offense.

### *Graham's Role in the January 6, 2021, Attack on the Capitol*

Daryl Graham traveled from his home in Maryland to Washington D.C. on the morning of January 6, 2021, to attend the former president's "Stop the Steal" rally. Following the rally, Graham traveled along the National Mall to the Capitol. (*Image 1*).



*Image 1: Graham – circled in yellow – walking along the National Mall following the former president's rally filming the actions of those around him.*

Graham arrived on the West Side of the Capitol around 2:00 p.m. Upon arrival at the Capitol, Graham moved through the mob to scaffolding assembled for the upcoming inauguration. Once Graham reached the scaffolding, Graham witnessed the chaotic scene as the mob overwhelmed police officers, violently pushing past police officers and moving deeper onto Capitol grounds.



*Image 2: Graham, in the yellow square, recording the mob near scaffolding erected for the upcoming inauguration.*

Graham then climbed the stairs adjacent to the inauguration scaffolding at 2:28 p.m. to the

Upper West Terrace. (*Image 3*).



*Image 3: Graham climbing to the Upper West Terrace.*

After Graham reached the Upper West Terrace, Graham observed the tumultuous scene

surrounding him as a horde of rioters moved under the scaffolding overtaking the vastly

outnumbered police in this area. After approximately thirty minutes on the Upper West Terrace

recording the actions of other rioters and documenting the scene around him, Graham moved

toward the West Stairs of a fire door near the Parliamentarian's office ("fire door"). Rioters violently breached this door at approximately 2:42 p.m. Graham approached the fire door at approximately 2:57 p.m. (*Image 4*)



*Image 4: Graham approaching the fire door.*

Immediately thereafter, at 2:58 p.m. Graham entered the Capitol. He moved with other rioters through the Brumidi Corridor while carrying a "STOP THE STEAL" sign, a reference to alleged improprieties in the 2020 presidential election. During this time, Graham continued to record the actions of the mob around him. (*Image 5*)



*Image 5: Graham inside the Capitol.*

Graham entered and remained in the Capitol for several minutes. Immediately before 3:00 p.m., officers began removing rioters from the Capitol by forcefully pushing the mob through the Brumidi Corridor – out the fire doors – to the Upper West Terrace. Graham was one of the rioters crowded in this location. Shortly thereafter, Graham left the Capitol building at 3:00p.m.

However, Graham did not leave Capitol grounds. Despite observing the events on the Upper West Terrace during this time – including assaults by rioters against police officers – Graham remained on, or near, the Upper West Terrace for at least another hour and a half after he exited the Capitol. At approximately 4:30p.m., officers attempted to escort rioters, including Graham, off Capitol grounds. (*Image 6*). Eventually, officers successfully removed Graham, and other rioters, from Capitol grounds.



*Image 6: Graham, circled in yellow, on the Upper West Terrace at 4:27 p.m., approximately an hour and half after he left the Capitol and nearly two hours after he arrived on Capitol grounds.*

*Graham's Facebook Use*

Prior to January 6, 2021, Graham used his Facebook account to discuss perceived election fraud with the 2020 presidential election. Immediately prior to the 2020 presidential election, Graham posted, "the only way they can win is to cheat."

Shortly after Graham left the Capitol January 6, 2021, he uploaded several images to his Facebook profile with associated comments boasting about his activities at the Capitol. (*Image 8*). Graham also acknowledged documenting much of his experience on January 6, 2021. After leaving the Capitol, he posted, "I have many more vids I won't even post but I can tell you, NOT ONE TIME did I ever feel unsafe… until the 'independent media' showed up."



*Image 8: Photo of Graham outside the Capitol that Graham posted on his Facebook profile on January 6, 2021.*

In one specific post, in response to another Facebook user's inquiry, "Where's the photo of you inside the Capital? [*sic*] Graham responded "…no comment."

Graham also used Facebook to spread conspiracy theories surrounding the events on January 6, 2021. On January 7, 2021, Graham posted, "they were chill for the most part but a

few… who had 'a few' started breaching the building. ANTIFA was there as well, breaking windows." At another point, Graham attributed the violence on January 6, 2021, to law enforcement when he stated "…yup the 'law enforcement' shot tear-gas, percussion grenades and rubber bullets at protesters, making some trample each other, throw up, have hearattacks, etc."

Graham also commented on the killing of Ashli Babbit. He stated "I don't agree with the breaking into the buildings, (like the Left's BLM/ANTIFA do with impunity), but now the government has murdered an American citizen protester, who just so happened to be unarmed, on the OPPOSITE side of a barrier and not an imminent threat. Wake up, 'we the people!!" [*sic*]. Additionally, the videos Graham uploaded to his Facebook profile revealed he spent significant time moving along a police line on the Upper West Terrace as the rioters around him consistently harassed and heckled police officers.

*The Charges and Plea Agreement*

On August 9, 2024, the United States charged Graham by a two-count Information with violating 40 U.S.C. § 5104(e)(2)(D) and 40 U.S.C.§ 5104 (e)(2)(G). On August 28, 2024, pursuant to a plea agreement, Graham pleaded guilty to both Counts of the Information, charging him with a violation of 40 U.S.C. § 5104(e)(2)(D) and 40 U.S.C. § 5104 (e)(2)(G). By plea agreement, Graham agreed to pay $500 in restitution to the Architect of the Capitol. *See* Plea Agreement ¶ 11.

### III.    Statutory Penalties

Graham now faces a sentencing for violating 40 U.S.C. § 5104(e)(2)(D) and 40 U.S.C. § 5104(e)(2)(G). As noted by the plea agreement and the U.S. Probation Office, Graham faces up to six months of imprisonment and a fine of up to $5,000. Graham must also pay restitution under the terms of his plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d

1072, 1078-79 (D.C. Cir. 2008). As this offense is a Class B Misdemeanor, the Sentencing Guidelines do not apply to it. 18 U.S.C. § 3559; U.S.S.G. §1B1.9.

## IV.    Sentencing Factors Under 18 U.S.C. § 3553(a)

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. In this case, as described below, the Section 3553(a) factors weigh in favor of 14 days' incarceration along with a probationary term of three years.

### A.  The Nature and Circumstances of the Offense

The attack on the U.S. Capitol on January 6 posed "a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). The attack "endangered hundreds of federal officials in the Capitol complex," including lawmakers who "cowered under chairs while staffers blockaded themselves in offices, fearing physical attacks from the rioters." *United States v. Judd*, 21-cr-40, 2021 WL 6134590, at *5 (D.D.C. Dec. 28, 2021). While assessing Graham's participation in that attack to fashion a just sentence, this Court should consider various aggravating and mitigating factors. Notably, for a misdemeanor defendant like Graham, the absence of violent or destructive acts is not a mitigating factor. Had Graham engaged in such conduct, he would have faced additional criminal charges.

One of the most important factors in Graham's case is his intent behind traveling to the Capitol on January 6, 2021, and his decision to remain on Capitol grounds for several hours. Graham demonstrated his intention behind going to the Capitol through his early Facebook posts that referenced improprieties in the 2020 election.

Graham believed, without evidence, that the 2020 election was fraudulent, and this motivated his intent and conduct in Washington D.C. on January 6, 2021. After the rally, he walked

to the Capitol. When he arrived on the West Front, he observed the mob's actions as they flooded deeper onto Capitol grounds. He recorded an onslaught of rioters traveling toward the Capitol via scaffolding assembled for the upcoming inauguration. Graham moved with the mob to the Capitol, while carrying a "Stop the Steal" sign, which is a reference to alleged improprieties with the 2020 election. Graham entered the Capitol at approximately 3 p.m. for several minutes but remained on the Upper West Terrace for a substantial period of time recording his actions. After he left the Capitol, he posted videos and photos on social media while making inflammatory and conspiratorial remarks regarding his experience.

Accordingly, the nature and the circumstances of this offense establish the clear need for a sentence of incarceration in this matter.

### B.  Graham's History and Characteristics

Graham is a 59-year-old self-employed handyman and seasonal tennis instructor. PSR ¶ 50. Graham reported a stable childhood. PSR ¶ 38. Graham is a lifelong resident of the Washington D.C. metropolitan area PSR ¶ 41. Graham has a daughter from a previous marriage but currently lives alone and rents a basement bedroom in Maryland. PSR ¶ 39, 41. Graham reported that he does not have a history of mental health or substance abuse issues. PSR ¶ 46 and 47. Graham has no criminal history. PSR ¶ 30.

### C.  The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot.  *See United States v. Cronin*, 22-cr-233-ABJ, Tr. 06/09/23 at 20 ("We cannot ever act as if this was simply a

political protest, simply an episode of trespassing in a federal building. What this was an attack on our democracy itself and an attack on the singular aspect of democracy that makes America America, and that's the peaceful transfer of power.")

### D. The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by Graham. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The need for general deterrence weighs heavily in favor of incarceration in nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. "Future would-be rioters must be deterred." (statement of Judge Nichols at sentencing, *United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37).

General deterrence is an important consideration because many of the rioters intended that their attack on the Capitol would disrupt, if not prevent, one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

The need for the sentence to deter Graham also weighs in favor of a term of incarceration.

Graham's Facebook comments prior to January 6, 2021, reveal troubling intent for his decision to travel to, enter, and remain inside of the Capitol on January 6, 2021. Graham was not an innocent bystander, aimlessly swept up by the crowd. He understood the context surrounding the events at the Capitol on January 6, 2021. He had previously addressed "cheating" and other

alleged improprieties surrounding the 2020 presidential election. Graham knew what he was doing and intentionally traveled to the Capitol holding a "Stop the Steal" sign.

Graham, eager to join the mob on Capitol grounds, relished the experience once he arrived. He posed for photos with other rioters and consistently held his phone over his head to record the violence around him. In his Facebook posts, Graham acknowledged that he saw "tear-gas, percussion grenades, and rubber bullets." Graham was with a flood of rioters at the base of scaffolding assembled for the upcoming inauguration. Graham chose to join this flood and climbed to the Upper West Terrace.

After he arrived on the Upper West Terrace, Graham observed the mob engage in violent behavior. Witnessing the mob's violence, including continued attempts to breach the Capitol at this location, had no impact on Graham's actions. He continued to linger around the Upper West Terrace for about 30 minutes. While on the Upper West Terrace between 2:30 and 3:00 p.m. the mob continued to violently attack police officers. At approximately 2:40 p.m. rioters violently fought with officers and broke down the fire door that Graham walked through at 2:58 p.m. Approximately twenty minutes later, at 3:00 p.m., Graham entered the Capitol through this fire door adjacent to the Parliamentarian's office while holding his "Stop the Steal" sign over his head. At 3:00 p.m., Graham left the Capitol but not voluntarily. Officers forcefully pushed rioters, including Graham, out of the Brumidi corridor – through the fire door – to the Upper West Terrace.

After Graham returned to the Upper West Terrace shortly after 3:00 p.m., he stayed on the Upper West Terrace observing and recording the day's events. The videos he posted to Facebook show that he walked along a police line where rioters heckled and harassed these police officers. Graham remained on the Upper West Terrace for at least another hour and a half prior to leaving the Capitol grounds. In total, Graham spent approximately 2 minutes inside the Capitol, and over

12

two hours on Capitol grounds on January 6, 2021.

Perhaps most emblematic of the need to deter Graham is his lack of remorse after leaving the Capitol. He celebrated the day's events and boasted to his social media followers about his actions and those of other rioters. He bragged about the footage he captured. He blamed the horrific events of January 6, 2021, on the "independent media." Despite no evidence, Graham echoed conspiracy theories and blamed the breach of the Capitol on Antifa. Perhaps most aggravating, he attributed the violence on January 6, 2021, to police officers by twisting the defensive tactics officers used against rioters as feigned proof that police officers were the aggressors that day. He spread conspiracy theories regarding a woman shot in front of the Speaker's Lobby, and directed his followers to "Wake Up." These statements and his general inclination to brag about the events on January 6, 2021, and shirk responsibility on others demonstrate that this Court should fashion an appropriate sentence that will deter Graham.

### E.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on police officers.[2] This Court must sentence Graham based on his own conduct and relevant characteristics, but should give substantial weight to the context of his unlawful conduct: his participation in the January 6 riot.

Graham has pleaded guilty to both Counts of the Information, charging him with violations of 40 U.S.C. § 5104(e)(2)(D) and 40 U.S.C. § 5104 (e)(2)(G). These offenses are Class B

---

[2] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

misdemeanor. 18 U.S.C. § 3559. Certain Class B and C misdemeanors and infractions are "petty offenses," 18 U.S.C. § 19, to which the Sentencing Guidelines do not apply, U.S.S.G. § 1B1.9. The sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C. § 3553(a)(6), do apply, however.

It is not often that the government recommends a sentence for January 6 defendants where the recommendation does not include at least some period of incarceration, even for misdemeanor plea defendants. Where it has, that recommendation commonly comes either from earlier cases where there were few comparators (especially as compared to now) or particularly unique circumstances. Neither of those situations are present here and a more common sentence of incarceration, is therefore, appropriate.

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the conduct in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

For example, in *United States v. Ruben Reyna*, 23-cr-350 (CKK), the government recommended 14 days' incarceration and 12 months' probation and the court imposed that recommendation.  ECF 25 (Sentencing Memorandum), 34 (Judgment). While Reyna entered a guilty plea on one count of 18 U.S.C. § 1752(a)(1), the case offers factual comparators for the Court's consideration. Like Graham, Reyna arrived at the Capitol on the West Front. Reyna, like Graham, both acknowledged observing the "chaotic" scene but chose to continue advancing toward the Capitol. While Reyna entered the Capitol along the Senate Wing, Reyna and Graham

spent short periods in the Capitol of approximately one and two minutes, respectively.  However, after Reyna departed the Capitol and returned to the upper West Terrace, he chose to leave the Capitol approximately 10 minutes later. Notably different was Graham's decision to remain on Capitol grounds for at least another hour and a half. Both Reyna and Graham posted multiple images and comments of their actions to Facebook following their departure. Reyna included photos of himself at the Capitol with "#OurHouse #StopTheSteal" and, like Graham, blamed Antifa and the police for any violence. Judge Kollar-Kotelly considered Reyna's post-January posts to Facebook as demonstrative of his immediate lack of remorse when imposing a sentence of incarceration.

Another example of a typical recommendation can be found in *United States v. William Wilkerson*, 23-cr-249 (CJN), where the Government recommended thirty days' incarceration and the Court imposed two years' probation on a guilty plea as to 40 U.S.C. § 5104(e)(2)(G).  ECF 21 (Sentencing Memo), ECF 24 (Judgment). Like Graham, Wilkerson was in the Capitol only for approximately five minutes and did not proceed deep into the Capitol building. Wilkerson showed no remorse in a voluntary post-arrest interview and, like Graham, posted multiple times on social media after his incursion into the Capitol.

Similarly in *United States v. Michael McCormick,* 21-cr-710 (TSC), Judge Chutkan sentenced McCormick to 14 days' confinement for violating 18 U.S.C. § 1752(a)(1). McCormick and Graham took similar paths to the Capitol. McCormick and Graham approached the Capitol from the West on January 6, 2021, and climbed to the Upper West Terrace, despite observing indications of riotous conduct, such as armored police and tear gas in the air.  McCormick entered the Capitol through the Senate Wing at approximately 2:55 p.m., three minutes before Graham entered the Capitol through a fire door directly adjacent to the Senate Wing. While McCormick

spent approximately 8 minutes in the Capitol, McCormick, like Graham remained on Capitol grounds for over an hour after exiting the building. Both McCormick and Graham recorded their actions in the Capitol and engaged in additional aggravating, yet different, conduct. McCormick deleted pictures and videos he took on January 6 from his phone and showed minimal remorse, while Graham boasted on social media about his actions and offered alternate narratives to his followers for the riot on January 6, 2021.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id.* at 1095.

IV.    **Restitution**

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011); *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA).[3] Generally, restitution under the VWPA must "be tied to the loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990); identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2); and is applied to costs such as the expenses associated with recovering from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

Those principles have straightforward application here. The parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that Graham must pay $500 in restitution, which reflects in part the role Graham played in the riot on January 6.[4] Plea Agreement at ¶ 11. As the plea agreement reflects, the riot at the United States Capitol had caused "approximately $2,923,080.05" in damages, a figure based on loss estimates supplied by the Architect of the Capitol and other governmental agencies as of July 2023." *Id.* (As noted above in footnote 1, the amount of damages

---

[3] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, including crimes of violence, "an offense against property … including any offense committed by fraud or deceit," "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss." 18 U.S.C.  § 3663A(c)(1).

[4] Unlike under the Sentencing Guidelines for which (as noted above) the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

has since been updated by the Architect of the Capitol, USCP, and MPD.) Graham's restitution payment must be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol and other victim entities. *See* PSR ¶ 24.

## V.    Fine

Graham's convictions for violations of 40 U.S.C. §5104(e)(2)(D) and 40 U.S.C. §5104(e)(2)(G) subject him to a statutory maximum fine of $10,000. *See* 18 U.S.C. § 3571(b). In determining whether to impose a fine, the sentencing court should consider Graham's income, earning capacity, and financial resources. *See* 18 U.S.C. § 3572(a)(1); *See* U.S.S.G. § 5E1.2(d). The sentencing guidelines require a fine in all cases, except where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine. U.S.S.G. § 5E1.2(a) (2023). Here, Graham's financial assets set forth in the PSR suggest that he is unable, and is unlikely to become able, to pay a fine.

## VI.    Conclusion

Sentencing requires the Court to carefully balance the § 3553(a) factors. Balancing these factors, the government recommends that this Court sentence Graham to 14 days' incarceration on Count One and 36 months' probation on Count Two. The government also requests that this Court impose 60 hours of community service, and, consistent with the plea agreement in this case, $500 in restitution. Such a sentence promotes respect for the law and deters future crime by imposing restrictions on Graham's liberty as a consequence of his behavior, while recognizing his acceptance of responsibility for his crime.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:    <u>s/ *Eli J. Ross*</u>
        Eli J. Ross
        Assistant United States Attorney
        Illinois Bar Number 6321411
        United States Attorney's Office
        601 D. Street, N.W.
        Washington, D.C.  20001
        Telephone: (202) 297-1515
        Email: Eli.Ross@usdoj.gov